BRETT N. ANDERSON (11809)
BLACKBURN & STOLL, LC
257 East 200 South, Suite 800
Salt Lake City, Utah 84111
Telephone:   (801) 521-7900
E-mail:   bretta@blackburn-stoll.com

*Attorneys for Plaintiff, NGM Insurance Company*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NGM INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) PLAINTIFF'S MOTION |
| | ) FOR SUMMARY JUDGMENT |
| v. | ) |
| | ) |
| RC MANAGEMENT, LLC d/b/a BACKYARD GREENS LLC, CECIL D. READ, ELIJAH BRUNSON, | ) Case No. 2:21-cv-00168 |
| | ) |
| | ) Judge: Jared C. Bennett |
| | ) |
| Defendants. | ) |

Pursuant to Fed. R. Civ. P. 56, Plaintiff, NGM Insurance Company ("NGM"), hereby moves the Court for summary judgment. The issue presented to the Court is whether NGM is required to defend RC Management, LLC d/b/a Backyard Greens LLC, Cecil D. Read, and Elijah Brunson (collectively referred to herein as "RC Management"). RC Management was sued in separate lawsuit styled as *Envyscapes Inc. v. Elijah Brunson, et al.*, Case No. 210400003 (4th Dist. Ct., Utah County) (the "Trade Secrets Litigation"). RC Management seeks defense and indemnity under the policy issued by NGM. The interpretation of the policy is a question of law. Based on the nature of the claims asserted against RC Management, NGM has no duty to defend or indemnify RC Management in the Trade Secrets Litigation.

I. **FACTS**

A. <u>**The Trade Secrets Litigation**</u>

1.  On January 4, 2020, Envyscapes Inc. ("Envyscapes") filed a complaint against Backyard Greens L.C., Elijah Brunson, and Cecil Read. *See* Complaint in the Trade Secrets Litigation, attached as Exhibit 1 to the Complaint on file herein. *See also* Answer of RC Management at ¶ 7, ECF No. 10.

2.  The following allegations are taken from the complaint in the Trade Secrets Litigation:

   a.  The Plaintiff, Envyscapes Inc., designs and installs residential and commercial golf greens. Preston Moon ("Moon"), the owner of Envyscapes, designed methods, formulas, and patterns relating to the design and construction of the greens, which give Envyscapes a competitive advantage. These trade secrets relate to the installation, finishing methods, bunkers, infill, and seaming of the greens. *Id.* at ¶¶ 9-16.

   b.  Envyscapes hired Elijah Brunson ("Brunson") on March 8, 2019. Brunson executed a Confidentiality and Non-Disclosure Agreement ("Confidentiality Agreement") on the day he was hired. *Id.* at ¶ 17.

   c.  Per the Confidentiality Agreement, Brunson agreed not to "copy, duplicate, replicate, reproduce, reverse engineer, scope or otherwise attempt to recreate in any form" any of Envyscapes' confidential information. *Id.* at ¶ 18.

   d.  Envyscapes disclosed its trade secrets to Brunson regarding the installation, finishing methods, bunkers, infill and seaming techniques—the very things that give Envyscapes "its competitive advantage." *Id.* at ¶ 21.

  e. Envyscapes terminated Brunson's employment in mid-December 2019. Thereafter, Brunson was hired by Backyard Greens. Cecil Read hired Brunson "with intent that he would disclose Envyscapes' trade secrets." *Id.* at ¶ 27.

  f. In support of its claims that Brunson shared trade secrets with Backyard Greens, Envyscapes excerpted what appear to be photographs from social media postings of Backyard Greens. *See* Complaint at ¶¶ 31-32.

  g. Envyscapes alleges that it was the "only company that used these formulas, patterns, methods, techniques and processes for design and installation of indoor synthetic turf." *Id.* at ¶ 33.

  h. Envyscapes claims that "Defendants misappropriated Envyscapes' trade secrets as to its indoor installation to complete approximately 100 projects between December 2019 and the present." *Id.* at ¶ 35.

  i. Envyscapes alleges that trade secrets were misappropriated relating to "finishing methods," (*id.* at ¶¶ 38-46), "bunkers," (*id.* at ¶¶ 47-56), "infill (*id.* at ¶¶ 57-66), and "seams" (*id.* at ¶¶ 67-75). In all instances, Envyscapes claims that defendants were "using" the trade secrets.

  j. Envyscapes asserts three causes of action: (1) Breach of Contract against Brunson; (2) Violation of the Utah Uniform Trade Secrets Act ("UTSA") against Brunson and Backyard Greens; and (3) Injunctive Relief against Brunson and Backyard Greens.

  k. Regarding the Breach of Contract claim, Envyscapes alleges that "Brunson breached the [Confidentiality] Agreement when he went to work for Read and disclosed Envyscapes' confidential trade secrets to Read, which Read used and continues to use." *Id.*

at ¶ 82.

l.  On the UTSA claim, Envyscapes alleges "Defendants' disclosure and use of these trade secrets constitute misappropriation of Envyscapes' trade secrets under the UTSA." *Id.* at ¶ 89.

m.  In the claim for injunctive relief, Envyscapes alleges "Defendants used and relied on Envyscapes' trade secrets and confidential information in the design and build of approximately 100 projects between December 2019 and the present." *Id.* at ¶ 95.

**B.  Declaratory Relief Action**

3.  RC Management tendered the Trade Secrets Litigation claim to NGM Insurance Company.

4.  NGM issued an insurance policy to RC Management, Policy No.: MPP4590M (the "Policy").1

5.  The Policy contains the following relevant provisions:

**A.  Coverages**

**1.  Business Liability**

**a.**  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.

However, we will have no duty to defend the insured against any "suit" seeking damages for bodily injury", "property damage," "personal and advertising injury", to which this insurance does not apply. We may at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

---

1 In their answer to the complaint, Defendants admit that the Policy attached to NGM's complaint is a true and accurate copy of the policy. *See* Answer at ¶ 16, ECF No. 10.

       **(1)**    The amount we will pay for damages is limited as described in Paragraph **D. –** Liability And Medical Expenses Limits Of Insurance in Section **II –** Liability; and

       **(2)**    Our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of judgments or settlements or medical expenses.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Paragraph **f.** Coverage Extension – Supplementary Payments.

  **b.**    This insurance applies:

…

       (2)    To "personal and advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

\*\*\*

**B.**    **Exclusions**

  **1.**    **Applicable To Business Liability Coverage**

This insurance does not apply to:
…

  **p.**    **Personal And Advertising Injury**

"Personal and advertising injury":

…

       **(12)**    Arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

\*\*\*

**F.** **Liability And Medical Expenses Definitions**

    **1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

        **a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

        **b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters.

…

    **14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

        **a.** False arrest, detention or imprisonment;

        **b.** Malicious prosecution;

        **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

        **d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

        **e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

        **f.** The use of another's advertising idea in your "advertisement"; or

        **g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

…

> **18.**  "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", or "personal and advertising injury" to which this insurance applies are alleged.

*See* Policy, attached to NGM's Complaint herein as Exhibit 2.

6. NGM has been defending RC Management, LLC d/b/a Backyard Greens LLC, Cecil D. Read, and Elijah Brunson in the Trade Secrets Litigation under reservation of rights.

## II.     AUTHORITY

**A.     Summary Judgment Standard.**

The standard for granting summary judgment on a request for a declaratory judgment is the same as for any other type of relief. *United States v. Gammache*, 713 F.2d 588, 594 (10th Cir. 1983). Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986).

**B.     Because there is No Predicate Offense or Causal Connection, there is No Coverage.**

"An insurance policy is merely a contract between the insured and the insurer." *Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1274 (Utah 1993). As a result, Utah courts interpret insurance policies as contracts: "if the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language." *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 21, 133 P.3d 428 (internal quotation marks omitted).

When a Utah court engages in a duty-to-defend analysis, it typically focuses on two documents: the insurance policy and the complaint. Generally, "[a]n insurer's duty to defend is determined by comparing the language of the insurance policy with the allegations of the

complaint." *Fire Ins. Exch. v. Estate of Therkelsen*, 2001 UT 48, ¶ 21, 27 P.3d 555 (internal quotation marks omitted); *see also Nova Cas. Co. v. Able Constr., Inc.*, 1999 UT 69, ¶ 8, 983 P.2d 575; *Sharon Steel v. Aetna Cas. & Sur.*, 931 P.2d 127, 133 (Utah 1997); *Deseret Fed. Sav. & Loan Ass'n v. United States Fid. & Guar. Co.*, 714 P.2d 1143, 1147 (Utah 1986) (comparing the allegations of the complaint with the terms of the insurance policy);

In *Therkelsen*, the Court explained an alternative formulation of the rule: "'The test is whether the complaint alleges a risk within the coverage of the policy.'" 2001 UT 48, ¶ 21 n. 3, 27 P.3d 555 (quoting *Continental Cas. Co. v. Alexis I. duPont Sch. Dist.*, 317 A.2d 101, 103 (Del. 1974)). "If the language found within the collective 'eight corners' of these documents clearly and unambiguously indicates that a duty to defend does or does not exist, the analysis is complete." *Equine Assisted Growth & Learning Ass'n v. Carolina Cas. Ins. Co.*, 2011 UT 49, ¶ 18, 266 P.3d 733. The burden of establishing coverage under an insurance policy is on those who seek to obtain coverage, even when if the insurer files a declaratory action to resolve the question. *Hartford Cas. Ins. v. Softwaremedia.com*, 2012 WL 965089, *5 (D. Utah 2012).

Here, the Policy imposes the duty to defend against any "suit" seeking damages for "personal and advertising injury." Suit is defined to mean a legal proceeding. Since the policy limits the duty to defend to the complaint filed in the lawsuit, the coverage determination here is limited to the allegations in Envyscapes' complaint. *See Employer Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1172 (10th Cir. 2010) (limiting coverage determination to the complaint and excluding extrinsic evidence based on duty to defend against any "suit).

The lawsuit filed by Envyscapes does not seek damages for bodily injury or property damage. Thus, the sole issue is whether there is coverage for personal and advertising injury.

Pursuant to the Policy, an advertising injury exists when there is an injury that arises out of one or more of the following offenses:

>   a. False arrest, detention or imprisonment;
>   b. Malicious prosecution;
>   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
>   d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
>   e. Oral or written publication, in any manner, of material that violates a person's right of privacy;
>   f. The use of another's advertising idea in your "advertisement"; or
>   g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

There are no allegations that RC Management committed any acts that would satisfy subparts a. through e. Thus, only subparts f. and g. are relevant to this case. There are, however, only a few cases in Utah that even address the personal and advertising injury provisions in an insurance policy. But even these few cases show that there is no coverage here.

In *Basic Research, LLC v. Admiral Ins. Co.*, 2013 UT 6, 297 P.3d 578 (Utah 2013), the court held that the plaintiff's claims for false advertising, defective product, and failure to perform as promised were not claims that would trigger a duty to defend under the personal and advertising injury provision of the policy. The Utah Supreme Court held that the policy required that the personal and advertising injury alleged in the complaint occurred as a result of the use of another's advertising idea (as that term was defined in the policy). In other words, the court found no duty to defend because none of the plaintiff's injuries occurred as a result of the use of another's advertising idea. Rather, the injury allegedly occurred because the product did not perform as promised. The court was looking for a causal connection between the insured's advertising and the injury alleged in the complaint.

-9-

In *Novell, Inc. v. Fed. Ins. Co.*, 141 F.3d 983 (10th Cir.1998), the Tenth Circuit Court of Appeals, applying Utah law, established a two-part test to determine whether an advertising injury is alleged, and, consequently, a duty to defend is triggered. Under that test, the court must first determine whether the complaint alleges a "predicate offense," that is, "one of the offenses specifically listed in the [policy's] definition of 'advertising injury.'" *Id*. at 986. If the first part of the test is satisfied, then the court must examine whether there is a causal connection between the alleged injuries and the advertising activities. *Id.*

In *Novell*, the plaintiff claimed that the defendant misappropriated the plaintiff's marketing of its software by creating an identical product that it sold in the marketplace. The *Novell* court determined that none of the claims alleged against the putative insured constituted a predicate offense (i.e., one of the offenses specifically listed in the Policy's definition of advertising injury). The *Novell* Court further found that even if one of the claims alleged against the insured had constituted a predicate offense, there was nothing in the complaint indicating such offenses were committed in the course of the insured advertising its goods, products or services.

In *Ohio Cas. Ins. Co. v. Cloud Nine, LLC*, 464 F. Supp. 2d 1161, 1166 (D. Utah 2006), *rev'd sub nom. The Ohio Cas. Ins. Co. v. Unigard Ins. Co.*, 458 F. App'x 705 (10th Cir. 2012),[2] the district court ordered the insurer to defend. Edizone sued Cloud Nine LLC for several different causes of action, including trademark infringement and common law trade name infringement and unfair competition. It was argued that the duty to defend was triggered under the advertising injury portion of the policy because Cloud Nine actually used Edizone's trade names in its advertising. The court noted that Edizone alleged Cloud Nine, LLC used Edizone's trade names "in their businesses, on

---

2 The 10th Circuit reversed the district court on the allocation of defense costs.

their websites," they "compete directly with Edizone in the same markets" and such conduct "is designed to cause confusion and mistake and to deceive purchasers into believing that Defendants' products are somehow sponsored by, made by, or associated with Edizone."

In *Hartford Cas. Ins. v. Softwaremedia.com*, 2012 WL 965089 (D. Utah 2012), the district court ruled that there was no duty to defend under the "advertising injury." In the complaint, Microsoft alleged that Softwaremedia caused damages by engaging in a "bait-and-switch" scheme. There was no connection to the advertisements of the putative insured. As explained by the court: "[w]hile Microsoft did allege injury to its copyright interests, it did not allege that the injury flowed from infringement in SoftwareMedia's "advertisements," but as the result of SoftwareMedia's fraudulent bait-and-switch sales activities involving licensing of software." *Id.* at *7. *See also IDG, Inc. v. Cont'l Cas. Co.*, 275 F.3d 916, 922 (10th Cir. 2001) (holding that allegations of copyright infringement do not assert "advertising injury" because they arise out of the insured's unlicensed copying and sale of the plaintiff's software, and not out of its promotional activity).

An out-of-state case styled as *Simply Fresh Fruit, Inc. v. Cont'l Ins. Co.,* 94 F.3d 1219 (9th Cir.1996) is very similar to the facts of this case. In *Simply Fresh*, the court found no duty to defend because the misappropriation did not arise in the course of advertising activities. In the underlying state court action, the insured's competitor alleged that the insured had misappropriated its "secret automated process for slicing fruit" by hiring its former employees, who then assisted the insured in developing a similar fruit-cutting device. *Id.* at 1220. The complaint in *Simply Fresh* failed to establish a duty to defend because the harm was caused by a misappropriation of trade secrets, and not by advertising. The court emphasized that, in order to trigger defense obligations, "the advertising activities must cause the injury—not merely expose it." *Id.* at 1223. So, even though the

defendant was passing off its competitor's intellectual property as its own, the harm was caused by the misappropriation of trade secrets and not by advertising.

Similarly, in another out-of-state case, the court in *Microtec Research, Inc. v. Nationwide Mut. Ins. Co.*, 40 F.3d 968 (9th Cir.1994) held that the underlying suit must "allege wrongdoing with respect to [the plaintiff's] advertisements," not just in connection with the plaintiff's product. *Id.* at 1222. "If the [insured] does some wrongful act and then advertises it, harm caused by the wrongful act alone is not within the scope of the term advertising injury." *Id.* at 971.

Here, the Policy requires that an "insured" becomes legally obligated to pay damages because of "personal and advertising injury" as a prerequisite to liability coverage. Personal and advertising injury includes "**[t]he use of another's advertising idea in your 'advertisement**'"; or "**[i]nfringing upon another's copyright, trade dress or slogan in your 'advertisement**.'" "Advertisement" is defined in the Policy as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters."

Based on the allegations in the Envyscapes complaint, there is no duty to defend the lawsuit filed by Envyscapes. The complaint does not reference RC Management's advertising activities. There are no allegations about any advertising ideas. On the contrary, the complaint focuses repeatedly on the designs, processes, and patterns created by Envyscapes (in other words, how Envyscapes physically creates and installs the golf greens) and the use by RC Management of these misappropriated trade secrets. Indeed, Envyscapes points to changes that RC Management made to its product offerings relating to infill, bunkers, and seams. The complaint does not establish a sufficient connection to the advertisements of RC Management. Indeed, there are no allegations that

RC Management's advertisements caused injury to Envyscapes. On the contrary, the allegations are that RC Management's use of the trade secrets caused harm to Envyscapes.

Like in *Simply Fresh*, the facts of which are remarkably similar to the case here,[3] any advertising only exposed the alleged injury, it did not cause the injury. Even if RC Management argued that the social media postings copied in the complaint constituted an advertisement, the alleged infringement would have occurred even if there had been no social media postings. *Farmington Causalty v. Cyberlogic Tech.*, 996 F.Supp. 695, 704 n. 17 (E.D. Mich. 1998) (stating "when the claim for infringement exists irrespective of the advertising activities, the claim for defense must fail"). There is no causal connection between RC Management's advertising activities and the harm alleged in the complaint.[4] At most, RC Management merely posted pictures of a product involving trade secrets that RC Management had already misappropriated.

In sum, there are insufficient allegations in the Complaint regarding use of another's advertising idea, or the use of another's copyright, trade dress or slogan. Consequently, even if trade secret misappropriation were a covered offense, the misappropriation alleged here did not occur in the course of advertising. In short, the allegations in the complaint show that this is case in which an

---

[3] The court noted: "The gravamen of Reddi–Made's state court action was that Simply Fresh and P & C had misappropriated its secret automated process for slicing fruit. The allegations underlying this complaint were that a former mechanic for Reddi–Made, while still employed by Reddi–Made, began to build an identical fruit cutting system and production line for Simply Fresh. Subsequently, Simply Fresh hired another ex-employee of Reddi–Made's, who allegedly solicited a third Reddi–Made employee to steal various parts from the processing system. At all times during these events, the Reddi–Made employees were parties to confidentiality agreements. Reddi–Made's complaint alleged that as a result of this misappropriation of its trade secrets, Simply Fresh was able to significantly cut its production costs and effectively destroy Reddi–Made's economic advantage." *Id.* at 1220. Those facts are very similar to the facts alleged by Envyscapes in the Trade Secrets Litigation.

[4] The advertising activity must be the source of the offense. The claim must at the very least relate to marketing, not to manufacture or production. *Winklevoss Consultants, Inc. v. Fed. Ins. Co.*, 991 F. Supp. 1024, 1034 (N.D. Ill. 1998).

alleged insured manufactured an infringing product and then merely exposed its conduct by posting on social media. Lastly, the complaint in the Trade Secrets Litigation case says nothing about copyrights, trade dress or slogans.

**C.     Even Assuming there is a Predicate Offense, the Policy's Exclusion Prevents Coverage.**

Even if RC Management could prove a predicate offense and a causal connection, exclusion (12) in the Policy still prevents coverage for the claims asserted in the Trade Secrets Litigation. Exclusion (12) states that there is no coverage for claims "arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. However, this exclusion does not apply to infringement, in your 'advertisement', of copyright, trade dress or slogan."

Based on Plaintiff's research there does not appear to be any controlling Utah decision interpreting this particular exclusion. Nevertheless, this exclusion is sometimes called the "intellectual property exclusion." In *Alterra Excess & Surplus Ins. Co. v. Snyder*, 234 Cal. App. 4th 1390, 1406, 184 Cal. Rptr. 3d 831, 841 (2015), the court explained that the "exclusion applies when the injury arises out of 'any violation of any intellectual property rights.'" The use of the phrase "or other intellectual property rights" suggests that the preceding terms are illustrative of the type of claims to which the exclusion applies. In other words, the list is not exhaustive. "The exclusion provides that intellectual property rights are those 'such as copyright, patent, trademark, trade name, trade secret, service mark or other designation of origin or authenticity.'" *Alterra Excess & Surplus Ins. Co.*, 234 Cal. App. 4th at 1406, 184 Cal. Rptr. 3d at 842.

A leading commentary describes the exclusion—which it also calls the "intellectual property" or "IP" exclusion—this way: "[T]he IP exclusion may preclude coverage for all claims

arising out of infringement of patent, trademark, trade secret, or other intellectual property rights, regardless of whether the infringement occurs in an 'advertisement.' Therefore, unfair competition claims that arise solely from a policyholder's trademark infringement are precluded from coverage by the IP exclusion." (4 New Appleman on Insurance Law Library Ed. (2014)) § 30.08[6][a], p. 30-136.4, fns. omitted (rel. 11-9/2014).)

The complaint in the Trade Secrets Litigation repeatedly alleges that RC Management misappropriated trade secrets. Based on the *Alterra Excess* case, the Appleman on Insurance explanation, and the plain language of the Policy, exclusion (12) applies and negates coverage. The exceptions to the exclusion do not apply here.

Based on the allegations in the complaint, Envyscapes did not allege that RC Management infringed on a copyright, slogan or trade dress. The terms copyright, slogan and trade dress are not used in the Complaint. For starters, claims regarding copyrights do not appear applicable in this coverage analysis at all. In this case, the complaint addresses the processes, techniques, and designs of commercial and residential golf greens. There are no allegations that these constitute copyrights or trade dress.

Nor has Envyscapes made any allegations about a slogan.[5] There is no reference in the complaint to slogan infringement; thus, the slogan exception is not applicable. *See St. Surfing, LLC v. Great Am. E & S Ins. Co.*, 776 F.3d 603, 609 (9th Cir. 2014) ("Because Street Surfing points to no facts alleged in the complaint or otherwise that would have given rise to an inference that slogan

---

5 In *Cincinnati Ins. Co. v. Zen Design Grp., Ltd.*, 329 F.3d 546, 556 (6th Cir. 2003), the Court defined "slogan" as a "distinctive cry, phrase, or motto of any party, group, manufacturer, or person; catchword or catch phrase." Random House Unabridged Dictionary 1800 (2d ed.1993). In *Hugo Boss Fashions, Inc. v. Federal Insurance Co.*, 252 F.3d 608 (2d Cir.2001), the court noted that federal courts have defined trademarked slogans as "phrases used to promote or advertise a house mark or product mark, in contradistinction to the house or product mark itself." *Hugo Boss*, 252 F.3d at 618.

infringement would be at issue in the Noll action, its claim for coverage under that provision fails."); *Interstate Bakeries Corp. v. OneBeacon Ins. Co.*, 686 F.3d 539, 546 (8th Cir.2012) (holding that the third-party complaint did not fall within the policy's slogan infringement coverage because, although "it is conceivable that 'Nature's Own' could serve as a slogan," the complaint made no "specific allegation relating to such a use" and the insured had not shown that the insurer otherwise knew of such a use).

**D.     The Claim for Injunctive Relief Falls when the Breach of Contract and UTSA Claims Fall.**

The injunctive relief claim alleges that RC Management misappropriated trade secrets on approximately 100 projects, and continues to do so. This claim does not allege the Envyscapes suffered damage as a result of RC Management's advertisements, but rather as a result of RC Management's historical and continued use of trade secrets. If Envyscape's breach of contract claim and UTSA claim do not trigger coverage, then the claim for injunctive relief based on those claims does not trigger coverage either.

### III.     CONCLUSION

For RC Management to sustain its burden that coverage is available under the Policy, it must demonstrate a predicate offense and a causal connection. *Basic Research, LLC v. Admiral Ins. Co.*, 2013 UT 6, ¶ 11, 297 P.3d 578, 580 ("But in order to trigger [insurer's] duty to defend, the underlying claims must allege 'personal and advertising injury' that occurred as a result of the "use of another's advertising idea.""). Given the allegations in the complaint, RC Management cannot do this. Thus, there is no duty to defend.

/ / /

DATED this 27th Day of July 2021.

BLACKBURN & STOLL, LC
/S/ Brett N. Anderson
Brett N. Anderson
Attorneys for Plaintiff
NGM Insurance Company

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2021, I caused to be served a copy of **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** on the following persons in the manner indicated below at the following addresses:

Bryan H. Booth
FETZER | BOOTH
50 West Broadway, #1200
Salt Lake City, UT 84101
bryan@mountainwestlaw.com

- ☑ by **CM/ECF**
- ☐ by **Electronic Mail**
- ☐ by **Facsimile Transmission**
- ☐ by **First Class Mail**
- ☐ by **Hand Delivery**

Dated this 27th Day of July, 2021

/S/ Brett N. Anderson
Brett N. Anderson